Plaintiff appeals from summary judgment for defendants in a defamation action.
At the time of the alleged defamation, the plaintiff, Theodis Dent (Dent), was employed by Miller Transporters, Inc. (Miller), as a truck driver. Miller had a key stop agreement with Chevron U.S.A., Inc. (Chevron) for loading fuel out of the storage tanks at Chevron's Powderly terminal in Jefferson County, Alabama. Defendant Lindsey Smith (Smith) was the terminal superintendent for the Powderly terminal.
Under the key stop agreement, Chevron assigned the number four pump at the terminal to Miller and issued keys to that pump to Miller drivers who were certified by Miller. Both the driver and his Miller supervisor signed for each key issued, and once a Miller driver had a key, he could unload fuel from the number four pump without supervision by Chevron. Miller agreed to pay Chevron for any fuel loaded through the number four pump, whether accounted for or not, because only Miller drivers could use that pump.
Until a Miller driver was certified and issued a number four key, he was required on each occasion to ask Chevron personnel for the number one (Chevron) key and load under Chevron's supervision through the number one (Chevron) pump. The number one key always stayed at the terminal.
Dent began loading and hauling fuel out of the terminal in March, 1978, by using the *Page 78 
number one key. In late 1978, Dent was issued a number four key and, from that time on, he could load without Chevron's supervision from the number four pump.
When Miller drivers loaded through the number four pump, they were supposed to document the load by inserting a multi-copied loading ticket (prestamped with the ultimate customer's name) into the pump, which would then record the date and gallons on the ticket, and the driver would simply leave a copy of the ticket in the box at the terminal on the way out. At least one Chevron supervisor was on duty at the terminal every day of the week except Sunday, but the certified Miller drivers could load any day of the week because each of them had a key to the main gate at the terminal, as well as to the number four pump. The number four pump would operate without a loading ticket being inserted.
On Monday morning, February 4, 1979, Smith learned that 2,251 gallons of diesel fuel had been loaded through the Miller pump and not been documented. No Miller driver had signed for a load for the (Sunday) evening before, and Smith asked Chevron personnel at the safety meeting on that Monday morning whether anyone had seen a Miller driver in the terminal on Sunday evening, February 3, 1979.
Smith was informed that day by a Chevron driver, Darnell Parker, that Parker had seen a Miller driver in the terminal on the previous evening, but that Parker did not know the Miller driver's name. Smith reported both the loss and the Parker information to Joe Sumrall, Miller's manager, and Smith and Sumrall agreed that each would do the best he could to identify the Miller driver whom Parker had seen. In the meantime, Chevron forwarded to Miller its claim for the loss, and Miller paid it.
On February 9, 1979, Dent inadvertently left his number four key at the terminal and when he went by to pick it up from Smith, Darnell Parker saw him. After Dent left, Parker identified Dent to Smith as the Miller driver Parker had seen in the terminal on Sunday evening, February 3, 1979. Smith then called Sumrall, identified Dent as the driver seen on February 3, 1979, and asked that Dent's keys be picked up. At Sumrall's request, Smith sent Sumrall a detailed statement and Smith also reported the series of events in writing to his superiors in Atlanta.
Dent was fired by Miller. He subsequently filed a union grievance concerning his termination and was found not guilty of stealing the fuel and was reinstated by Miller. However, he was still prohibited from hauling fuel from the Chevron Powderly terminal.
On August 2, 1979, Dent filed a complaint which alleged slander and libel per se arising out of the oral and written statements of Smith, while acting within the line and scope of his duty as an agent for Chevron.
The defendants filed an answer which sets forth the following defenses: general denial, privilege, conditional privilege, and lack of malice.
The depositions of Dent and Smith were taken on September 24, 1979, and on October 16, 1981, the court granted defendants' motion for summary judgment. This appeal followed. We affirm.
In his brief, Dent states:
 "The Appellant also frankly concedes that, under the facts and circumstances of this case, the defendants probably did enjoy qualified or conditional privilege; however, plaintiff strenuously argues that summary judgment was inappropriate in this case due to the presence of evidence inferring malice, lack of good faith, and abuse of privilege."
We agree with the appellant only to the extent that the facts in this case do establish the presence of a qualified privilege. See, Berry v. City of New York Insurance Company,210 Ala. 369, 98 So. 290 (1923).
Further,
 "[w]here a communication is conditionally privileged, it is free from the legal imputation of malice and is actionable only if there is actual malice. O'Barr v. Feist, 292 Ala. 440, 296 So.2d 152 (1974). The *Page 79 
burden is on plaintiff to prove actual malice. Interstate Electric Company v. Daniel, 227 Ala. 609, 151 So. 463 (1933).
 "This Court has recognized that disposition of the issue of actual malice by summary judgment is generally inappropriate. Loveless v. Graddick, 295 Ala. 142, 325 So.2d 137 (1975). However, where no proof of malice is offered at all, summary judgment is appropriate. Id.
"Actual malice
 "`. . . may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like.'
 "Kenney v. Gurley, 208 Ala. 623 at 626, 95 So. 34 at 37."
Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, at 1120 (Ala. 1976).
The record reveals that Smith scarcely knew Dent. There was no evidence that he bore any ill will towards him. This is clearly indicated through Dent's deposition testimony concerning a discussion between Dent and Smith after Dent's termination:
 "Q. (By Mr. Lightfoot) Tell me everything you said and everything Lindsey Smith said when you called him on the phone that Monday.
 "A. Well, I just asked him did he know anything about, you know, me getting the fuel. He said, `Well, we got proof that you did it, and if you want to take it further, you can.'
 "I said, `Well, I will try, you know — I'm going — I'm going to look further in detail.' They never did tell me the man's name that said I stole the fuel or nothing. I didn't say nothing else to him. I hung up the phone.
"Q. Was it a short conversation?
 "A. It was a short conversation, wasn't over three or four words.
 "Q. Have you told me everything that you remember about that conversation?
 "A. As far as I remember about that conversation, because it was just a few words, and he said, `Well, you can take it further if you want.' And I said, `Well, that's it then.'
"Q. You didn't get mad, and he didn't get mad?
"A. No.
"Q. It was a very pleasant conversation?
"A. Very pleasant conversation."
We hold that the plaintiff has offered no evidence whatsoever that would constitute actual malice on the part of the defendants, not even a scintilla. Rather, the record reveals a classic situation for which the qualified privilege was designed, i.e., a straightforward business communication made in the performance of duty. See, Ripps v. Herrington, 241 Ala. 209, 1 So.2d 899 (1941). We hold, therefore, that summary judgment was appropriate in this case.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.